**INJURY TO BRAKEMAN THROWN FROM MOVING TRAIN.**

[Circuit Court of Lucas County.]

LAKE SHORE & MICHIGAN SOUTHERN RY. CO. v. FRED. VOGELSON.

Decided, January 14, 1902.

*Negligence—Railways—Brakeman Falls from Caboose—Evidence as to Contributory Negligence—Failure to Disclose at the Time of the Accident One of the Alleged Causes—Custom as to Signaling—Compromise Verdict—Settlement.*

1. Where an employe who has been injured in an accident fails to mention one of the alleged causes at the time his statement is taken following the accident, doubt is cast upon his testimony as to such alleged cause, when made long after in court in support of a claim for damages.
2. In the absence of evidence of a custom of giving a signal before cutting off an engine used as a pusher in helping a freight train over a grade, the failure to give such a signal on the occasion of the accident is not negligence, if the engine was cut off in the usual manner.

3. A finding by a jury against a claim of settlement is against the weight of the evidence, where the claim of settlement is supported by the fact that after coming out of a hospital where he was treated at the expense of the company, the plaintiff accepted a sum of money and signed a receipt in full of all claims growing out of the accident, and remained in the employ of the company for two years without complaint, and the only evidence against the claim of settlement is that given by the plaintiff four years after the accident.

HULL, J.; HAYNES, J., and PARKER, J., concur.

Heard on error.

The defendant in error in this action was the plaintiff below, and brought his action against the Lake Shore & Michigan Southern Railway Company to recover for personal injuries which he claimed he sustained on account of negligence of the railway company. The case was tried to a court and jury, and at the conclusion of the plaintiff's testimony the defendant moved the court to instruct the jury to return a verdict for the defendant. This motion was overruled and the case proceeded and a verdict was finally returned by the jury in favor of the plaintiff for the sum of $500. Motion for a new trial was made by the defendant, which was overruled and a judgment entered in favor of the plaintiff for the amount of the verdict, and it is to reverse this judgment that a petition in error was filed in this court.

There were two general defenses by the railway company:

First. That it was not guilty of negligence.

Second. That whatever claim the plaintiff had against the company was settled, and that for a valuable consideration he released the company from all liability.

Evidence was offered to sustain both these defenses.

The plaintiff in error claims that the court erred in refusing to take the case from the jury at the conclusion of plaintiff's testimony; and next, in overruling the motion for a new trial, on the ground that the verdict was not sustained by sufficient evidence and was therefore contrary to law.

Although some other questions are made in the record, these are the only questions that are passed here, and the only ones of sufficient importance to consider in the discussion of the case.

The accident occurred in the western part of the city of Toledo, near Air Line Junction and near the overhead bridge of the Michigan Central Railway Company. Vogelson was a brakeman on a freight run between Toledo, Ohio, and Elkhart, Indiana, and on the day of his injury, May, 17, 1897, he was starting with his train for Elkhart. In order to help the train start and push it over the grade, it was pushed by a pony engine to a place near the overhead bridge mentioned.

The pony engine is called a "pusher," and when in the judgment of the conductor of the pony engine it was not necessary to go further, the custom was to cut off the engine or "pusher" and the train then proceeded on its way without further assistance.

On this occasion, when the pony engine was cut off from the train, Vogelson was on top of the caboose, which was immediately in front of the pusher, and he fell off, his claim being that the locomotive was cut off without warning, and so suddenly that the slack of the trian was thereby suddenly released and he was thrown, or jerked off the top of the caboose by the jar or jerk that was occasioned by the cutting off of the pusher; and that is one of the acts of negligence complained of, to-wit, that the locomotive was cut off so suddenly as to constitute negligence, thereby jerking him off the top of the caboose; and it is further claimed, that no signal, by whistling or otherwise, was given him of the intention of the engineer to cut off the locomotive, and that was also negligence.

Vogelson testifies that as he stood on the roof or deck of the caboose, he could see that the locomotive was cut off, or about to be cut off, and he heard the noise of the train as the slack was let out, and knew that there would be a jar or jolt; that to guard himself, he took hold of the iron hand-hold or "grab-iron," which is a round iron, three or four feet long, immediately over the door of the cupola of the caboose; that he took hold of this to protect himself, and he claims that when the jar came, the hand-hold was pulled out at both ends, came off the framework of the caboose, and that he then fell off and was injured in his knee and his back. He jumped up as soon as he struck the ground and climbed up on the caboose and went on his way

to Elkhart, not thinking at that time that he was very seriously injured, his injury not causing him a great deal of pain, although he limped some therefrom.

The railway company denies that the "pusher" was cut off with any more suddenness than usual, or that it was done in a negligent manner, and denies that this hand-hold or grab-iron was out of repair, or improperly fastened to the caboose, and denies that it pulled out as Vogelson claimed that it did. And the railway company claims that the manifest weight of the evidence is in favor of its contention, and that, therefore, the court erred on this branch of the case in not granting a new trial; and the company claims further, as has been stated, that Vogelson afterwards settled with the company and released it from all claims.

Vogelson in his testimony stated his claim as to the facts substantially as I have given them. When he reached Elkhart, he met there George Beck, who was a claim agent of the company, and Beck told him that he wanted a statement of the accident, and Vogelson, in the presence of his brother, E. E. Vogelson, who was at that time living at Elkhart, gave Beck a statement of the accident, which was reduced to writing by Beck and signed by Vogelson.

In this statement, which is attached to the bill of exceptions, he gives his version of the accident and says that when they were near the Michigan Central overhead bridge "the pony engine was uncoupled from the rear end of caboose and the slack went back and I was thrown off the caboose on to the ground. I don't know which pony it was. I consider that I was thrown off caboose on account of the engineer or pony engine shutting off too quick and without warning. It is the custom for the ponys to go as far as depot at Air Line Junction. I was in a position on caboose where I could see that the engineer shut off suddenly, and I made an effort to save myself but could not do so. I lit on my feet, and my back struck a rail, bruising back. Continued with my run on to Elkhart and expect to continue with work without laying off. No physician required."

He states his residence and the fact that he is married and has children and has been in the service of the company three years. That is signed by him and signed by his brother, E. E. Vogelson, as a witness. This statement was written on a printed blank, and the printed part of the paper recites that "said injuries were not due to any negligence or carelessness on the part of any boss, foreman, engineer, conductor or yardmaster in the employ of said company," etc.

Another paper, bearing the same date, was also offered in evidence, signed by Vogelson. This paper purports to release the company from all liability. It is a printed blank. It says in substance, that in consideration of the payment of one dollar and his re-employment by the company, the company is released from all claims arising out of injuries set forth therein. There is at the end of the paper a receipt for one dollar, signed by Vogelson. Vogelson claims that he knew nothing of this second paper, that is, the white paper, but admits signing the yellow paper, being the one first above referred to. Beck testifies to Vogelson's having signed both papers. It was the duty of Vogelson, when this accident occurred, to state the facts to his conductor, in order that he might report them; and, on their way to Elkhart, he met the conductor on the train and told him what had occurred, that he had been thrown off the train.

According to the testimony of the conductor, he said nothing to him about the hand-hold having been out of repair, he made no mention of that, but did tell either the conductor or the brakeman that he took hold of the hand-hold with his crippled hand—it seems that he had one finger off of one hand—and that if he had taken hold with his "good hand" he could have held on.

This Vogelson denies. He also talked with the other brakeman, Mr. Felton, on the way to Elkhart, and told him about his being jerked off from the top of the caboose, but said nothing to him about the hand-hold being out of repair or pulling off.

Vogelson claims that the screws that fastened the hand-hold at each end of the iron pulled out; that when he got back on the top of the caboose he drove them in again with a coupling-

link and left them in that condition.  No other witness testifies to this hand-hold being out of repair.  The two car inspectors at Toledo, Mr. Phillips and Mr. Kundz, inspected the caboose just before it left Toledo, and they testified that the hand-hold was in good repair.  No one is called from the yards at Elkhart to testify that the hand-hold was out of repair.  Both the conductor and the other brakeman upon the freight train testify that they used this hand-hold frequently upon this trip and that it was not out of repair.

The hand-hold was immediately over the small door of the cupola of the caboose and was used by the men in getting in and out of the cupola and was necessarily used frequently both by the conductor and the brakemen, in making the trip.

About midway between Toledo and Elkhart, Vogelson exchanged places with the other brakeman, Felton, the latter taking the rear end and Vogelson went to the front, so that Felton was on the caboose the rest of the trip, and he testifies that he saw nothing out of order with the hand-hold.

It would seem impossible for this hand-hold to have been pulled out and the screws pulled out of the wood and then driven back in again by Vogelson in such a way that it would not have been discovered.

Vogelson's claim that this hand-hold pulled out on this occasion rests entirely upon his own uncorroborated testimony. Besides that, as appears from the written statement which he made at Elkhart to Mr. Beck, he said nothing to him at that time, the next day after the accident, about the hand-hold pulling out.  Vogelson claims that Beck did not read this statement to him; he admits that he signed it, but says that Beck did not read it to him; he says that he made a statement to Beck telling him the facts about the accident, and Beck took it down in writing, and then he, Vogelson, signed it, but Vogelson does not claim in his testimony that he said anything to Beck about the hand-hold being out of repair.

There is no claim made that the statement of the facts of the accident, as set down by Beck in this paper, was not as given to him by Vogelson on the next day after the accident occurred;

nor does E. E. Vogelson, the brother, who was present, make any claim of that kind in his testimony.

This caboose, according to the undisputed testimony, was comparatively a new car. The hand-hold was fastened at either end with long screws, nearly three inches in length, which were set into a piece of oak some two inches thick, or thereabouts, going entirely through that and a small distance into the pine of the car, and this oak piece was securely fastened to the side of the car. If the hand-hold had pulled out, as Vogelson claims, it seems almost impossible that he would not have stated this to Mr. Beck, in Elkhart, the next morning after the accident. To have had a hand-hold so insecurely fastened to the side of the car as to pull out in this way, would have been a very serious defect in a car and probably would have been negligence on the part of the company if the defect had existed for any length of time, and when he was called upon to make his statement to the claim agent, being a railroad man of some experience and having had two accidents before this in which he had signed papers, he knew the purpose of asking for this statement; he knew that it was to be sent to the offices of the company to be kept there on file as his version of the accident; he knew the importance of stating all of the facts that would be favorable to him if he contemplated making any claim against the company for damages; but, notwithstanding all this, and notwithstanding, further, that it was his duty as an employe of the railroad company to state all of these facts, he says nothing whatever at this time in regard to the hand-hold being out of repair.

It seems to us that the manifest and clear weight of the evidence is against him upon that proposition. He is contradicted by the conductor and by the brakeman upon this very train; he is contradicted by his own statements made upon the trip upon which he was injured and by his failure to make this statement to Mr. Beck, upon the day after the accident. And the fact that a man does not speak when he would naturally be expected to speak, or when it is his duty to speak, as in making a statement of this kind, tends to impeach his testimony

when he afterwards testifies to facts that were not stated under these circumstances.

The court of common pleas instructed the jury that so far as any claim for want of a signal was concerned before the engine was cut off no evidence of negligence had been offered against the company, for it had not been shown that it was the custom to give a signal before the pony engine was cut off.   This ruling we think was correct.

It was claimed that the engineer of the "pusher" was negligent in cutting off as suddenly as he did, Vogelson claiming that he was thereby jerked off of the top of the caboose.   He made this claim immediately after the accident and he made it in the statement which he signed before Beck.   A large number of witnesses, perhaps nearly all of the witnesses, except Vogelson himself, testify that the locomotive was cut off in the usual way.   It is true that sometimes this occasions more of a jar than at other times; it is impossible for an engineer to cut an engine off in exactly the same way every time.   It was known that it would cause some jar or jerk to the train and the men expected it and Vogelson knew that this was coming.

Without reviewing the testimony upon that point, it appears to us to be doubtful, at least, whether he ought to recover upon that ground, the weight of the testimony perhaps appearing to be against him upon that proposition; but still he testifies himself positively that there was a very severe jerk at the time the locomotive was cut off, much harder than usual, and that he was unable to stand on top of the roof, and if it was cut off with such a jerk as he testifies to, it would doubtless constitute negligence on the part of the company, and the court properly overruled the motion of the railroad company to direct a verdict for the defendant.

Coming to the other defense:  It is claimed that whatever claim Vogelson had against the company was settled and released.   On the day following the accident he signed the paper to which I have referred, a printed blank, agreeing upon the face of it to release all claims in consideration of his re-employment and the payment of one dollar.   He testified, however, that he had no knowledge of signing such a paper, that he only

signed one paper, and he is corroborated by the testimony of his brother; and perhaps the weight of the testimony is in favor of Vogelson as to this claim.

Vogelson continued with his work after May 17, but his knee grew worse and its condition became very serious, and on October 11, following, he went to the hospital, under the care of the railway company and at their expense, and had an operation performed upon his knee, which had gotten into a very bad condition. He had two or three operations performed upon the knee, water having collected at the knee-joint. After being at the hospital two or three weeks, he went back to his home at Toledo and was around and about and occasionally called at the office of Mr. Brown, the claim agent of the company in the city, and Brown promised to do what he could for him; and finally Brown received a letter from the company saying that they offered to settle with Vogelson for $40. Brown testifies that he told Vogelson this; and that a day or two after that, he received the money from the company and went to Vogelson's house and met him there, and that Vogelson agreed to the settlement and agreed to accept forty dollars; that he paid it to him and Vogelson then signed a receipt, and, a full and complete release of all claims against the railroad company.

The release recites that:

"For the consideration of forty dollars received to my full satisfaction of the Lake Shore & Michigan Southern Railway Company, I hereby release and discharge the said company from all claims and demands against it, and especially from all liability to me for personal injuries of whatever kind, nature or description, received by me at Air Line Junction, Ohio, on May 18, 1897, by being thrown from top of caboose to the ground, injuring my back and right knee; and for said consideration said company is hereby released and discharged from any and all claims and demands in any manner arising from or growing out of said accident; also from part loss of time and wages while I was unable to work on account of said accident. Received payment October 27, 1897.

"FRED VOGELSON."

This was witnessed by Ross Buckmaster and Geo. B. Brown, agent of the company. Mr. Vogelson claims that at the time he

signed that paper he was not in a condition mentally to understand what he was doing. He admits that Mr. Brown came to the house and he remembers receiving $40. Further than that, he says his recollection is not distinct and he supposed that whatever he did sign was simply a receipt for the $40 paid him by the railway company; that he expected more and that he had no intention to sign a release in full.

No witness other than himself testifies that Vogelson was at this time insane or in such a mental condition that he was unable to understand what he was doing, in the ordinary affairs of life. Dr. Bowman, who was his physician at that time, testifies that his understanding was not very acute at that time; that he had suffered a great deal from his injuries and that physical suffering always affects the mind; that he was in need of money, and that, in his judgment, he would have been willing to sign almost any paper in order to get money to help him, but he does not testify that Vogelson was mentally unsound or incapable of understanding such a paper.

Mr. Brown testifies, as to all the facts and circumstances surrounding the transaction, that he was entirely friendly with Vogelson; that Vogelson met him at the door, resting upon one crutch; that he talked the matter over with him and paid him the money; that he called young Buckmaster, his brother-in-law, to witness the paper, and that the paper was read over to Vogelson.

Vogelson went back to his work on the following February and he continued to work for the company during that year, off and on, his limb troubling him at times. And during the year 1899 he continued to work for the company, sometimes on one job and sometimes on another. He made no complaint during all that time that any advantage had been taken of him in the signing of this receipt, but he stated, according to the testimony of Mr. Bennet, the conductor of the freight train, that he had settled with the company; and made the same statement to Mr. Felton, the other brakeman, and substantially the same to Mr. Whiting, who was a clerk for the company.

These men, especially the conductor and brakeman, were friendly to Mr. Vogelson, and Bennet and Felton were fellow

trainmen with him. It does not appear that they were seeking to take any advantage of him. They say that he voluntarily told them what had occurred; that he had settled with the company.

We are of the opinion that the evidence in this case shows that Mr. Vogelson did, on October 27, 1897, voluntarily settle his claim, whatever he had, against the railway company. We are unable to believe that he at that time was in such a condition that he did not understand what he was doing. He had been working for the company up to about October 11, when he became worse and went to the hospital. He seemed to comprehend what occurred at the hospital and the operations that were performed. He was apparently able to leave the hospital when he was discharged from it, at least, he came home again and was up and about the house. He called at the office of Mr. Brown, in Toledo, and talked with him about his case occasionally, and no witness, except Vogelson himself, testifies to anything which would indicate mental unsoundness on his part or inability to understand fully what occurred at the time this paper was signed. We think that the evidence that he settled at that time and that he fully understood that he was settling, is full and convincing.

He remained with the company after that time for a period of over two years, without any complaint. In considering this branch of the case we must also consider the fact that the claim that he had against the company, and which he must have known, was at best, a very doubtful claim. We are of the opinion that his claim that the hand-hold was pulled out, was not sustained by the evidence; that his statement as to that is not true, and that his claim that the locomotive was cut off in such a manner as constituted negligence, is very doubtful. Now, having a claim of this kind, he was doubtless willing to make such a settlement as he could with the railway company.

His request, after his knee became worse, was, not that the railway company should pay him any substantial sum for damages, but that they give him some employment easier and lighter than he had before, or that they permit him to go to the hospital at their expense in order that he might have an operation performed. These two requests were granted. His request after

the operation had been performed was that he might have employment in his injured condition, and he was given jobs that he could do. During all that year of 1898 and 1899 he was working from time to time for the company in different capacities and without any complaint that advantage had been taken of him, until about the last of December, 1899, when he quit the employment of the company, and on January 2, 1901, a little less than four years after his injury, he began this action.

His injury turned out to be quite serious; his knee was so hurt that it has never fully recovered; he is still lame and the injury probably is permanent. The amount of the verdict was small, $500, and indicates a compromise on the part of the jury. Had he been entitled to recover against the company, by reason of negligence, for the injuries which the evidence shows he sustained, and the condition he is now in, he would have been entitled to a much larger sum than $500.

I only speak of this to show that the jury that heard the case, some of them at least, must have been very doubtful of the plaintiff's claim. We can only decide this case according to the evidence and according to law, and while we may sympathize with Mr. Vogelson in his condition, the only question here is, whether his injuries are due to the negligence of the company, and whether he has settled and released any claim that he may have had against the company; and after a very careful examination of the record, we have reached the conclusion that the verdict is not sustained by sufficient evidence; that the finding of the jury that he did not settle with the company and release it is manifestly against the weight of the evidence, and that the court for this reason erred in overruling the motion for a new trial. We find no other error in the record.

For these reasons the judgment of the court of common pleas will be reversed and the case remanded.

*E. D. Potter,* for plaintiff in error.

*Harvey Scribner* and *W. A. Owen,* for defendant in error.